EXHIBIT A

Arbitral award issued in the arbitration *Serama S.A. v. Bariven S.A.*, (ICC Case No. 25207/JPA (C-25208JPA)) on July 30, 2021 (the "**Award**").

# ARBITRATION UNDER THE RULES OF THE INTERNATIONAL CHAMBER OF COMMERCE

**ICC Case No. 25207/JPA (C-25208/JPA)**

SERAMA, S.A. – (Republic of Panama)

Claimant

**vs/**

BARIVEN, S.A. – (Bolivarian Republic of Venezuela)

**Respondent**

---

# FINAL AWARD
# 30 July 2021

---

**Arbitral Tribunal**
Juliet BLANCH
Pilar PERALES VISCASILLAS
Dirk DE MEULEMEESTER (President)

<u>For Claimant</u>
Jean Paul DECHAMPS
Gustavo TOPALIAN
Pablo JAROSLAVSKY
Juan Ignacio GONZÁLEZ MAYER

DECHAMPS INTERNATIONAL LAW

Alexandra SCHLUEP
Roelien VAN DEN BERG

SSHJ ADVOCATEN

Jonathan J. GASS

<u>For Respondent</u>
Not represented

**Table of Contents**

I.    THE PARTIES ................................................................................................................1

II.   PRELIMINARY MATTERS ...........................................................................................2
      A.   Arbitration Agreement ...................................................................................2
      B.   Applicable Law ...............................................................................................2
      C.   Place of Arbitration – Language ....................................................................2
      D.   Procedural Rules .............................................................................................3

III.  FACTUAL BACKGROUND – NATURE OF THE DISPUTE ........................................4

IV.   SUMMARY OF THE PROCEEDINGS .........................................................................6

V.    NOTIFICATIONS – DUE PROCESS ..........................................................................11

VI.   CLOSING OF THE PROCEEDINGS AND TIME LIMIT FOR THE AWARD..............13

VII.  PARTIES' PRAYERS FOR RELIEF ...........................................................................14
      A.   Claimant .......................................................................................................14
      B.   Respondent...................................................................................................15

VIII. SYNTHESIS OF LEGAL AND FACTUAL ISSUES TO BE ADDRESSED AND ISSUES FOR
      DETERMINATION ........................................................................................................16

IX.   ARBITRAL TRIBUNAL'S ANALYSIS AND CONCLUSIONS......................................17
      A.   Does the Arbitral Tribunal have jurisdiction over this dispute? ....................17
      B.   Did Respondent breach its obligations under the Purchase Orders and is Claimant
           entitled to receive payment of the outstanding invoices under the Purchase Orders?19
      C.   Is Claimant entitled to receive statutory interests for commercial transactions
           (capitalized annually) on the outstanding invoices in accordance with Article 6:119a
           DCC?..............................................................................................................39
      D.   Which of the Parties shall bear the costs of the arbitration, including legal fees and
           costs (and post-award interests on these amounts), or in what proportion shall the
           costs be borne by the Parties? .....................................................................41

X.    FINAL AWARD .............................................................................................................44

LIST OF (most used) ABBREVIATIONS

| Bariven | A company incorporated under the laws of Venezuela (*Sociedad Anónima*), Edificio Petróleos de Venezuela, Torre Este, Av. Libertador, La Campiña, Distrito Metropolitano de Caracas, Distrito Capital, 169, Bolivarian Republic of Venezuela |
|---|---|
| Claimant | Serama |
| DCC | Dutch Civil Code |
| DCP | Dutch Code of Civil Procedure |
| ICC Rules | Rules of Arbitration of the International Chamber of Commerce in force as from 1 March 2017 |
| ICC Court | The International Court of Arbitration of the International Chamber of Commerce |
| Serama | A company incorporated under the laws of Panama (*Sociedad Anónima*), Calle Elvira Méndez, Edificio Vallarino, Tercer Piso, Oficina 2, Apartado Postal 0843-02999, City of Panama, Republic of Panama |
| Parties | Serama and Bariven |
| PO No. 1 | Purchase Order No. 5100098888 of 13 June 2012 |
| PO No. 2 | Purchase Order No. 5100102528 of 19 October 2012 |
| PDVSA Services | PDVSA Services B.V. A company incorporated under the laws of The Netherlands (*Besloten Vennootschap*), President Kennedylaan 19, 2517 JK The Hague, The Netherlands |
| Purchase Orders | PO No. 1 and PO No. 2 |
| Party | One of the Parties |
| Respondent | Bariven |
| Terms of Reference | Terms of Reference as approved by the ICC Court on 22 December 2020 |
| T&C | Terms and Conditions For Goods Purchases Revision 08-2009 |

## I.      THE PARTIES

1.      Claimant, SERAMA S.A. (hereinafter: **Claimant** or **Serama**), is a company incorporated under the laws of Panama, Calle Elvira Méndez, Edificio Vallarino, Tercer Piso, Oficina 2, Apartado Postal 0843-02999, City of Panama, Republic of Panama.

2.      Claimant is represented in this arbitration by DECHAMPS INTERNATIONAL LAW, Jean Paul DECHAMPS (jpdechamps@dechampslaw.com), Gustavo TOPALIAN (gtopalian@ dechampslaw.com), Pablo JAROSLAVSKY (pjaroslavsky@dechampslaw.com) and Juan Ignacio GONZÁLEZ MAYER (jgmayer@dechampslaw.com), 10 Bloomsbury Way, London, WC1A 2SL, United Kingdom and SSHJ ADVOCATEN, Alexandra SCHLUEP (a.schluep@sshj.eu), Roelien VAN DEN BERG (r.vandenberg@sshj.eu), De Lairessestraat 97, 1071 NX Amsterdam, The Netherlands and Jonathan J. GASS (jjg@gassarbitration.com), 19 King Frederick Ninth Tower, London.

3.      Respondent, BARIVEN S.A. (hereinafter: **Respondent** or **Bariven**), is a company incorporated under the laws of Venezuela, Edificio Petróleos de Venezuela, Torre Este, Av. Libertador, La Campiña, Distrito Metropolitano de Caracas, Distrito Capital, 169, Bolivarian Republic of Venezuela; C/O PDVSA Services B.V., President Kennedylaan 19, 2517 JK The Hague, The Netherlands.

4.      Respondent is not represented in this arbitration.

II.     PRELIMINARY MATTERS

A.  Arbitration Agreement

5.      The present dispute arises out of the PDVSA Services BV Terms and Conditions For Goods Purchases Revision 08-2009 ('**T&C**'), which governed two purchase orders, identified as No. 5100098888 of 13 June 2012 ('**PO No. 1**'), and 5100102528 of 19 October 2012 ('**PO No. 2**') (jointly '**Purchase Orders**').

6.      The jurisdiction of the arbitral tribunal arises from Article 27 of the T&C:

"*Any and all disputes, controversies and claims arising out of, involving, or relating to the Order shall be referred to, settled and finally resolved exclusively by arbitration under the rules of the ICC International Court of Arbitration (the "Rules") by three arbitrators appointed in accordance with the Rules. All procedural matters arising in connection with any arbitration shall be resolved in accordance with the Rules. The Party commencing the arbitration shall appoint one arbitrator and the defendant Party shall appoint one arbitrator and a third arbitrator will be appointed by the two arbitrators appointed by the Parties, in accordance with the Rules. The existence of any dispute or the initiation or continuance of the arbitration proceedings shall not postpone, suspend or delay the obligation of the Parties to perform or the performance by the Parties of their respective obligations pursuant to this Agreement. The payment of the costs and expenses of the arbitration will be determined by the arbitrators. The place of the arbitration shall be The Hague. The language used in the arbitral proceedings shall be English.*"

B.  Applicable Law

7.      Article 25 of the T&C provides:

"*The Order and all resulting or connected orders and/or agreements and all connected rights and obligations (including any claims based on tort) shall be governed by and construed in accordance with the law of The Netherlands.*"

8.      The law of The Netherlands is thus applicable to the merits of the case.

C.  Place of Arbitration – Language

9.      Article 27 of the T&C provides:

"*The place of the arbitration shall be The Hague. The language used in the arbitral proceedings shall be English.*"

2

10.     Thus, the place of arbitration is The Hague, The Netherlands and the language of the arbitration is English.

**D. Procedural Rules**

11.     The present arbitration was conducted in accordance with the Rules of Arbitration of the International Chamber of Commerce in force (at the time of the dispute) as from 1 March 2017 (hereinafter: '**ICC Rules**'). In cases where the ICC Arbitration Rules are silent, as provided under Article 8.1 of the Terms of Reference, the Arbitral Tribunal shall, pursuant to Article 27 of the T&C, apply the procedural (arbitration) law of The Netherlands.

12.     According to Article 8.2. of the Terms of Reference, the Arbitral Tribunal and the Parties shall be guided but not be bound by the 2010 IBA Rules on the Taking of Evidence in International Commercial Arbitration. In case of doubt concerning the meaning of these rules, the interpretation of the Arbitral Tribunal shall be determinative. Where these rules are silent, the procedure shall be regulated by the Arbitral Tribunal, unless the Parties agree otherwise.

3

III.     FACTUAL BACKGROUND – NATURE OF THE DISPUTE

13.     Claimant is a company incorporated under the laws of Panama. Its business entails the purchase, sale and distribution of goods, merchandise and equipment.

14.     Respondent is a wholly owned Venezuelan subsidiary of Petróleos de Venezuela S.A. (PDVSA), the Venezuelan state-owned oil and natural gas company, which is also active in other sectors of the Venezuelan economy. For over two decades, Respondent has been in charge of PDVSA's foreign purchases of goods and services.

15.     The Claimant brings its claims against Respondent pursuant to the T&C, which governed the Purchase Orders.

16.     Under each Purchase Order, Respondent ordered goods from Claimant.

17.     PO No. 1 concerned the acquisition of equipment for construction works and PO No. 2 concerned the acquisition of two hundred (200) vehicles. Each Purchase Order was preceded by a Request for Quotation.

18.     Each Request for Quotation states:

        "*UNLESS OTHERWISE AGREED THE PARTIES IN WRITING AND BEFORE ISSUING OF THE PO, OUR PDVSA SERVICES BV STANDARD TERMS & CONDITIONS FOR GOODS PURCHASES Rev.08-2009 OR FOR SERVICES PURCHASES Rev. 00-2009 RULES AND GOVERNS THE RELATIONSHIP BUYER-VENDOR IN THIS PROCESS.*"

19.     The T&C contain several sections:

        1.      DEFINITIONS
        2.      ACCEPTANCE
        3.      MODIFICATION AND ASSIGNMENT
        4.      PRICE AND PAYMENT TERMS
        5.      TAXES
        6.      DELIVERY AND DELAY IN DELIVERY
        7.      FORCE MAJEURE
        8.      ERRONEOUS OR EXCESS MATERIALS
        9.      RISK AND TRANSFER OF OWNERSHIP
        10.     INTELLECTUAL PROPERTY RIGHTS
        11.     PATENT, TRADEMARK AND COPYRIGHT INDEMNITY
        12.     WARRANTIES

| | |
|---|---|
| 13. | INDEMNIFICATION |
| 14. | PROPRIETARY DATA |
| 15. | INDEPENDENT CONTRACTOR |
| 16. | INSURANCE |
| 17. | COMPLIANCE WITH LAWS |
| 18. | PUBLICITY |
| 19. | GIFTS |
| 20. | CANCELLATION FOR CONVENIENCE |
| 21. | CANCELLATION FOR DEFAULT |
| 22. | SUSPENSION OF PERFORMANCE |
| 23. | IMPORTER OF RECORD |
| 24. | EXPORT AUTHORIZATIONS |
| 25. | CHOICE OF LAW |
| 26. | ENTIRE AGREEMENT |
| 27. | ARBITRATION |

20.    Claimant delivered the goods ordered by Respondent under each Purchase Order (see Section IX, B, b. of this Award), but Respondent did not pay the invoices received from Claimant.

5

IV.     SUMMARY OF THE PROCEEDINGS

22.     On 24 March 2020 the ICC Secretariat acknowledged receipt of two Requests for Arbitration, including a request for consolidation.

23.     In its Requests for Arbitration, Claimant indicated that in accordance with the arbitration agreement the dispute is submitted to a three-member Tribunal and nominated Ms Juliet Blanch.

24.     On 22 April 2020 the ICC Secretariat notified the Requests for Arbitration to Respondent.

25.     On 13 May 2020 the ICC Secretariat informed Claimant that the notification by email of the Requests for Arbitration to Respondent was without success.

26.     On 22 May 2020 the ICC Secretariat informed Claimant that the second notification by courier on 13 May 2020 of the Requests for Arbitration to Respondent to its address in The Netherlands failed and that the notification by courier of Claimant's Request to Respondent at its address in Venezuela was not made (no delivery).

27.     On 27 May 2020 Claimant informed the ICC Secretariat as follows:

        "*the Claimant wishes to inform the Secretariat that, on 26 May 2020, the Claimant was able to effect a personal notification of the Requests to the Respondent (including its annexes and all relevant correspondence from the ICC Secretariat) at its registered offices in Caracas, Venezuela (see exhibit attached). The Claimant attaches to this email the copy of the cover letter of this notification stamped as received on 26 May 2020 by the Respondent, alongside an affidavit signed by the Venezuelan attorney who delivered the documents to the Respondent on behalf of the Claimant. A courtesy translation of these documents is also attached hereto.*"

28.     On 30 May 2020 the ICC Secretariat clarified that its courier service informed that on 15 May 2020, rather than 13 May 2020, it was unable to notify the Requests for Arbitration to BARIVEN S.A. *c/o* PDVSA Services BV in the Netherlands. Accordingly, as per Claimant's instructions and pursuant to Articles 3(2) and 3(3) of the ICC Rules, the notification of the Requests for Arbitration to Respondent's address in the Netherlands was deemed to have been made on said date (i.e., 15 May 2020) and all time limits shall start running from 15 May 2020.

29.     On 24 September 2020 the ICC Court:

- decided to consolidate the arbitrations (Article 10(c) of the ICC Rules): 25208/JPA SERAMA S.A. (Panama) vs/ BARIVEN S.A. (Venezuela) into 25207/JPA SERAMA S.A. (Panama) vs/ BARIVEN S.A. (Venezuela)
- confirmed Juliet Blanch as co-arbitrator upon Claimant's nomination (Article 13(1) of the ICC Rules); and
- directly appointed Pilar Perales Viscasillas as co-arbitrator on behalf of Respondent, which failed to nominate a co-arbitrator (Article 13(4)(a) of the ICC Rules).

30.   On 8 October 2020, pursuant to Article 13(2) of the ICC Rules, the Secretary General confirmed Dirk De Meulemeester, as president of the Arbitral Tribunal upon the joint nomination of the co-arbitrators.

31.   Pursuant to Article 16 of the ICC Rules the file was transmitted to the Arbitral Tribunal on 8 October 2020.

32.   On 21 October 2020 the Arbitral Tribunal sent a first letter to the Parties including the invitation for the Case Management Conference, the draft Terms of Reference and the draft Procedural Order nr. 1. This letter was communicated by email and – to Respondent – by registered post with receipt (BPost – RF099875055BE) to the address of Respondent in The Hague. This letter was received by Respondent on 27 October 2020 at 09h18.

33.   As required by Article 24 of the ICC Rules, the Tribunal convened a Case Management Conference to consult the Parties on procedural measures that may be adopted pursuant to Article 22(2) of the ICC Rules and Appendix IV to the ICC Rules.

34.   The Case Management Conference was held on 10 November 2020 at 14h00. Respondent did not participate in the Case Management Conference, notwithstanding that Respondent was duly notified thereof by way of the aforementioned first letter.

35.   On 16 November 2020 the Arbitral Tribunal sent a second letter to the Parties with the signed Procedural Order nr. 1 containing *inter alia,* the procedural calendar and the final draft of the Terms of Reference for signature by the Parties. This letter was communicated by email and – to Respondent – by registered post with receipt (BPost – RF099878750BE) to the address of Respondent in The Hague. This letter was received by Respondent on 21 November 2020 at 09h58.

36.   By way of the aforementioned second letter to the Parties, the Parties were invited by the Arbitral Tribunal to send the signed version of the Terms of Reference no later than 30 November 2020.

7

37.     On 17 November 2020 the Arbitral Tribunal received the signature of counsel for Claimant with regard to the Terms of Reference.

38.     On 30 November 2020 Respondent had not communicated to the Arbitral Tribunal a signed version of the Terms of Reference.

39.     By way of a letter dated 1 December 2020 the Arbitral Tribunal submitted the Terms of Reference to the ICC Court for approval, *i.e.* in accordance with Article 23(3) ICC Rules.

40.     The former letter was communicated to the Parties by way of the third letter from the Arbitral Tribunal dated 1 December 2020. This letter was communicated by email and – to Respondent – by registered post with receipt (BPost – RF100418130BE) to the address of Respondent in The Hague. This letter was received by Respondent on 12 December 2020 at 10h08.

41.     On 22 December 2020, the ICC Court approved the Terms of Reference signed by Claimant and the Arbitral Tribunal (Article 23(3) ICC Rules). By way of its letter dated 22 December 2020, the ICC Court invited Respondent to sign the Terms of Reference as approved by the Court and to return it within 15 days from the day following the receipt of said letter.

42.     The ICC Court further informed the Arbitral Tribunal and the Parties on 22 December 2020 that the time limit for the rendering of the final award was six months from the notification to the Arbitral Tribunal of the Court's approval of the Terms of Reference (Article 31(1) ICC Rules), *i.e.* 22 June 2021.

43.     On the due date for Respondent's submission of its Statement of Defence (8 January 2021), nothing was received.

44.     In accordance with Procedural Order nr. 1 a second Case Management Conference was held on 11 January 2021 at 14h00. Respondent did not participate in the Case Management Conference, notwithstanding the fact that Respondent was duly notified thereof by way of the aforementioned second letter detailing the procedural calendar (cfr. Procedural Order nr. 1).

45.     During the second Case Management Conference the Arbitral Tribunal informed the Party that was present that it would formulate several issues/questions to the Parties by way of a Procedural Order nr. 2.

46.     On 18 January 2021 the Arbitral Tribunal sent a fourth letter to the Parties holding Procedural Order nr. 2. With the same letter the Parties were invited to participate in a third Case Management Conference on 19 February 2021. This fourth letter was communicated by email and – to Respondent – by registered post with receipt (BPost – RF089573149BE) to the address

8

of Respondent in The Hague. The delivery of this letter failed because Respondent refused the letter (mentioned on the returned envelope). On 4 February 2021 the Arbitral Tribunal sent the fourth letter a second time by registered post with receipt (BPost – RF089574348BE) to the address of Respondent in The Hague. The delivery of this letter failed again because Respondent refused the letter (mentioned on the returned envelope).

47.     In accordance with Procedural Order nr. 2 counsel for Claimant informed the Arbitral Tribunal on 18 January 2021 that it would submit a response to the Arbitral Tribunal's questions as soon as possible, and in any event no later than by 5 February 2021.

48.     In accordance with Procedural Order nr. 2 counsel for Claimant filed its answer on 6 February 2021 at 01:41 am.

49.     Respondent did not file any response in relation to the issues/questions raised in Procedural Order nr. 2.

50.     In accordance with the fourth letter to the Parties a third Case Management Conference was held on 19 February 2021 at 11h00. Respondent did not participate in the case management conference, in spite of Respondent being duly notified thereof by way of the aforementioned fourth letter.

51.     On 22 February 2021 the Arbitral Tribunal sent a fifth letter to the Parties. This letter was communicated by email and – to Respondent – by registered post with receipt (BPost – RF106132577BE) to the address of Respondent in The Hague. The delivery of this letter failed because Respondent refused the letter (mentioned on the returned envelope).

52.     With the fifth letter the Arbitral Tribunal informed the Parties that it had no further questions for the Parties and that it was established during the third Case Management Conference that the Parties would be able to submit a final brief on costs and interest (the latter with regard to Claimant's claim) no later than 5 March 2021. In addition, the Arbitral Tribunal informed the Parties that it would, after having received the Parties' final briefs, proceed with the closing of the proceedings, no later than 15 March 2021. Finally, the Arbitral Tribunal submitted all the details and material evidence on how it communicated with the Parties, in particular with Respondent (by way of registered letter with receipt).

53.     On 5 March 2021 Claimant filed its Submission on Interest on Claimed Amounts and on Costs of the Arbitration.

54.     On 15 March 2021 the Arbitral Tribunal sent a sixth letter to the Parties to inform the Parties that the proceedings were closed in order to allow the Arbitral Tribunal to take the case into

9

consideration. Since on that date the matter of the advance payments on fees and expenses of the Arbitral Tribunal and the ICC's administrative fees was still pending, the Parties were allowed to update their submission on costs on a later date if need be. This letter was communicated by email and – to Respondent – by registered post with receipt (BPost – RF106066691BE) to the address of Respondent in The Hague. The delivery of this letter failed because Respondent refused the letter (mentioned on the returned envelope).

55.    On 12 May 2021, the ICC Court approved the draft award (Article 34 ICC Rules) submitted by the Arbitral Tribunal and fixed the ICC administrative expenses and the Arbitral Tribunal's fees (Article 38 ICC Rules). Since the ICC was not in a position to guarantee payment to the Arbitral Tribunal, it was proposed that the Parties shall pay the Arbitral Tribunal's fees and expenses directly.

56.    Following the payment of the Arbitral Tribunal's fees and expenses by the Claimant, Claimant filed an update on the arbitration costs and its claim by letter of 15 July 2021.

10

## V.   NOTIFICATIONS – DUE PROCESS

57.   Respondent did not participate in these arbitration proceedings, nor did Respondent show sufficient cause for its default.

58.   Particular care was given by the Arbitral Tribunal regarding the notification of all procedural steps throughout the proceedings to all Parties and especially to the defaulting Party. Respondent was given the full opportunity to participate in the proceedings. The Arbitral Tribunal's continuous efforts to notify Respondent is documented in this award.

59.   Article 3(2) ICC Rules states that all notifications or communications from the Arbitral Tribunal shall be made to the last address of the party or its representative for whom the same are intended, as notified either by the party in question or by the other party. Such notification or communication may be made by delivery against receipt, registered post, courier, email, or any other means of telecommunication that provides a record of the sending thereof.

60.   Article 3(3) ICC Rules states that a notification or communication shall be deemed to have been made on the day it was received by the party itself or by its representative, or would have been received if made in accordance with Article 3(2).

61.   The Arbitral Tribunal relied on Claimant with regard to Respondent's proper contact details, *i.e.* the contact details mentioned in the requests for quotation and the Purchase Orders[1], and Claimant was informed of the way Respondent was notified by the Arbitral Tribunal.

62.   Pursuant to Articles 3(2) and 3(3) of the ICC Rules, the notification of the Requests for Arbitration made the Secretariat to Respondent's address in the Netherlands was deemed to have been made on 15 May 2020. The discrepancy between the address to which the Requests for Arbitration was sent by Claimant in Venezuela on 26 May 2020 and the address to which the procedural communications were sent in the Netherlands (The Hague), has therefore no bearing on Respondent's right to be heard. Since the address in the Netherlands (The Hague) was the one detailed in the Purchase Orders (which constitutes the agreement between the Parties), the Arbitral Tribunal is of the considered opinion that Respondent was aware of all the communications sent by the Arbitral Tribunal. The record shows that it was only as of the issuance of the Fourth Letter that the Respondent decided to refuse the Arbitral Tribunal's communications (See section 45 of this Award).

---

[1] The Purchase Orders mention: BARIVEN,S.A., c/o PDVSA Services, B.V., Purchasing Agent, President Kennedylaan 19, 2517 JK The Hague The Netherlands; and mentions a Dutch telephone number. With regard to invoicing, the Purchase Orders mention the following: "*First class or registered mail address: PDVSA Services, BV. Attn: Accounts Payable, PRESIDENT KENNEDYLAAN 19, 2517 JK THE HAGUE, THE NETHERLANDS; Courier service mailing address: PDVSA Services, BV. Attn: Accounts Payable, 2517 JK THE HAGUE, THE NETHERLANDS, Contact Number: (31)70-3488522, Contact Fax: (31) 70 3488540*"

63.     The Arbitral Tribunal was cautious to act fairly and impartially, giving each party a reasonable opportunity to present his case and to deal with that of its opponent. Moreover, the Arbitral Tribunal adopted procedures suitable to the circumstances of the particular case, avoiding unnecessary delay or expense, so as to provide a fair means for the resolution of the matters.

64.     Notwithstanding the fact that Respondent – as the defaulting party – did not respond to any correspondence, Respondent was kept copied in on all correspondence between the Arbitral Tribunal and the non-defaulting party, *i.e.* Claimant. Respondent was sent all procedural orders and notices of all case management conferences. Thus, the Arbitral Tribunal continuously ensured that all Parties were fully informed and duly notified of the proposed proceedings and of any applicable deadlines or time limits. The Arbitral Tribunal kept a record of all communications with Respondent and informed Claimant thereof (what, when and how).

65.     The Arbitral Tribunal further made sure that it could not be seen to favour either party and did all that was reasonably possible to ensure that Respondent was aware of the Arbitral Tribunal's timetable and time limits.

66.     Finally, there was no obligation on the Arbitral Tribunal to hold a hearing, given that the documentation provided was sufficient to determine the issues before it and Claimant did not request a hearing (*cfr.* Article 25(5) ICC Rules).

**VI.   CLOSING OF THE PROCEEDINGS AND TIME LIMIT FOR THE AWARD**

67.   Pursuant to Article 31(1) of the ICC Arbitration Rules, the Final Award "*must* [be] *render*[ed] […] [within] *six months* […] *from the date of the last signature of the arbitral tribunal or by the parties of the Terms of Reference* […]." Under Article 31(2) of the ICC Arbitration Rules, "[t]*he* [ICC] *Court may extend the time limit pursuant to a reasoned request from the arbitral tribunal or on its own initiative if it decides it is necessary to do so.*"

The ICC Court informed the Arbitral Tribunal and the Parties on 22 December 2020 that the time limit for rendering the final award was 22 June 2021 (six months from the notification to the Arbitral Tribunal of the Court's approval of the Terms of Reference) (Article 31(1) ICC Rules).

68.   On 15 March 2021, the Arbitral Tribunal informed the Parties that the proceedings were closed and that the case was taken into consideration.

69.   The ICC Court informed the Arbitral Tribunal and the Parties on 17 June 2021 that the time limit for rendering the final award was 30 July 2021.

70.   During its session of 15 July 2021, the ICC Court extended the time limit for rendering the final award until 31 August 2021.

**VII.  PARTIES' PRAYERS FOR RELIEF**

**A.      Claimant**

71.      By way of its Requests for Arbitration, Claimant requests the Arbitral Tribunal to:

"*DECLARE that it has jurisdiction to decide these disputes;*

*DECLARE that Bariven breached its contractual obligations towards Serama and Dutch law;*

*ORDER Bariven to pay the Claimant the total outstanding principal amount of US$ 28,931,000.00 or such other amount that the Tribunal deems appropriate;*

*ORDER Bariven to pay interest on the amounts calculated in accordance with Article 6:119a of the DCC from thirty (30) days of the receipt of each unpaid invoice, or from such other time the Tribunal deems fit, until effective payment;*

*ORDER Bariven to pay all costs and fees of the Arbitrations, including the administrative fees and costs of the ICC, the fees and expenses of the Tribunal and of any experts appointed by it, and the Claimant's legal and other costs in these proceedings, with interest; and*

*AWARD any other or further relief that the Tribunal may consider appropriate.*

*The claims made by the Claimant or that may come to be made by the Claimant in the Arbitrations are made without prejudice to any and all claims of whatsoever nature that the Claimant has or may come to have against Bariven under Dutch law or any other applicable law. The Claimant hereby expressly reserves all rights in respect of such claims and nothing in these Requests for Arbitration should be considered as a limitation of any kind on questions of fact or law that the Claimant may invoke in any proceedings against Bariven.*"

72.      By way of its Submission on Interest on Claimed Amounts and on Costs of the Arbitration dated 5 March 2021, Claimant reiterated its claims as follows:

*(a) ORDERING Bariven to pay the Claimant US$28.931.000,00 as a result of Bariven's breach of its contractual obligations towards the Claimant and Dutch law;*

*(b) ORDERING Bariven to pay the Claimant the applicable pre-award interest (capitalized annually) on the Claimant's unpaid invoices, as provided in Article 6:119a of the Dutch Civil*

*Code and as detailed –for the relevant dates of an award– in Table 3* [para 6 of the Submission]*;*

*(c) ORDERING Bariven to reimburse all costs of the arbitration that have been incurred by the Claimant, in the amount of US$1.011.710,27;*

*(d) ORDERING Bariven to pay the Claimant post-award interest (capitalized annually) as provided in Article 6:119a of the Dutch Civil Code, on the amounts in sections II and III* [of the Submission]*; and*

*(e) CONCEDING any other reparatory measures that the Tribunal deems appropriate.*

**B.    Respondent**

73.    Respondent did not submit any prayers for relief.

15

**VIII. SYNTHESIS OF LEGAL AND FACTUAL ISSUES TO BE ADDRESSED AND ISSUES FOR DETERMINATION**

74.     In accordance with Article 11(1) of the Terms of Reference, the issues to be determined by the Arbitral Tribunal "*shall be those resulting from the Parties' pleadings and submissions*". Considering the submissions of the Parties, the Arbitral Tribunal found that the following questions must be determined to give a just and adequate answer to the Claimant's prayers for relief.

   A. Does the Arbitral Tribunal have jurisdiction over this dispute?

   B. Did Respondent breach its obligations under the Purchase Orders and is Claimant entitled to receive payment of the outstanding invoices under the Purchase Orders?

   C. Is Claimant entitled to receive statutory interests for commercial transactions (capitalized annually) on the outstanding invoices in accordance with Article 6:119a DCC?

   D. Which of the Parties shall bear the costs of the arbitration, including legal fees and costs (and post-award interests on these amounts), or in what proportion shall the costs be borne by the Parties?

## IX.      ARBITRAL TRIBUNAL'S ANALYSIS AND CONCLUSIONS

### A.      Does the Arbitral Tribunal have jurisdiction over this dispute?

75.      Article 1052(1) DCP states that the arbitral tribunal shall have the power to rule on its own jurisdiction.

76.      Article 6(3) ICC Rules provides that if any party against whom a claim has been made does not submit an Answer, the arbitration shall proceed and any question of jurisdiction shall be decided directly by the arbitral tribunal.

77.      Article 1052(1) DCP states that a party that *has appeared in the arbitral proceedings* must raise a plea that the arbitral tribunal does not have jurisdiction on the ground of non-existence of a valid arbitration agreement before submitting a defence, on pain of forfeiting its right to rely on the latter, in the arbitral proceedings or before the court, unless this plea is made on the ground that the dispute is not capable of settlement by arbitration according to Article 1020(3) DCP[2].

78.      Respondent did not raise a plea in *limine litis* that the arbitral tribunal does not have jurisdiction. In fact, Respondent has not appeared in the arbitral proceedings.

79.      From this follows – and such is commonly accepted in international arbitration in the event of an absent respondent – that the Arbitral Tribunal must examine its jurisdiction *ex officio*.[3]

80.      Claimant's claim is based on two purchase orders, PO No. 1 and PO No. 2 (see Section IX, B, b. of this Award), more in particular the invoices which followed the delivery of the goods ordered under these Purchase Orders which remained unpaid. The communications between the Parties[4] clearly show that the Purchase Orders constitute the agreement between the Parties on which the Claimant relies in these arbitration proceedings.

81.      Both Purchase Orders refer/mention the T&C or PDVSA Services BV Terms and Conditions For Goods Purchases Revision 08-2009.

---

[2] Article 1020(3) DCP: "*The arbitration agreement shall not serve to determine legal consequences of which the parties cannot freely dispose.*"
[3] Craig, Park and Paulsson, International Chamber of Commerce Arbitration, 3rd ed, 2001, Oxford University Press, p. 153, §10.07; Born in: International Commercial Arbitration, p. 24403.
[4] With regard to PO No 1: On 27 April 2012, Respondent sent a Request for Quotation nr. 6500204279 to Claimant (Exhibit C-3). On 18 May 2012, Claimant filed an offer as part of the bidding process (Exhibit C-4). On 13 June 2012, Claimant received from Respondent the PO No. 1 (Exhibit C-5). On 27 June 2012 Claimant confirmed having received and accepted the PO No. 1 (Exhibit C-6). With regard to PO No 2: On 19 September 2012, Respondent sent a Request for Quotation nr. 6500227262 to Claimant (Exhibit C-8). On 27 September 2012, Claimant filed an offer as part of the bidding process (Exhibit C-9). On 19 October 2012, Claimant received from Respondent the PO No. 2. On 27 December 2012 Claimant confirmed having received and accepted the PO No. 2 (Exhibit C-11).

82.    Article 27 of the T&C provides for a clear and unambiguous arbitration agreement for any and all disputes, controversies and claims arising out of, involving, or relating to the Order(s).

83.    Such disputes are to be settled and finally resolved exclusively by arbitration under the rules of the ICC International Court of Arbitration by three arbitrators appointed in accordance with the Rules.

84.    From the above follows that there exists a valid arbitration agreement between the Parties contained in the Parties' agreement with regard to the subject matter of the dispute.

85.    The Arbitral Tribunal holds that it has jurisdiction over the dispute.

18

**B.** **Did Respondent breach its obligations under the Purchase Orders and is Claimant entitled to receive payment of the outstanding invoices under the Purchase Orders?**

*a. General*

86.     Article 1043a(2) DCP states that if a respondent, although reasonably given the opportunity to do so, fails to submit its defence, without asserting well-founded reasons, the arbitral tribunal may immediately make an award.

87.     Article 1043a(3) DCP states that in such award, the claim shall be awarded, unless it appears to the arbitral tribunal to be unlawful or unfounded. The arbitral tribunal may, before making its award, require proof from the claimant of one or more of its assertions.

88.     According to Article 6(8) ICC Rules, if any of the parties refuses or fails to take part in the arbitration or any stage thereof, the arbitration shall proceed notwithstanding such refusal or failure. At the same time the arbitral tribunal must make every effort to make sure that the award is enforceable at law (Article 42 ICC Rules).

89.     Thus, an arbitral tribunal is required to review the evidence presented to it, satisfy itself that the case has been proven, and provide reasons for its conclusion in its final award.

90.     The final award in a proceeding with an absent or defaulting party is like any other award, the only difference being a one-sided participation in the process. The claims have to be established and proven to the satisfaction of the Arbitral Tribunal.

*b. Facts of the case*

91.     The facts of the case can be described as follows.

92.     Claimant was incorporated in Panama on 7 November 2006 by Herlinda Suarez and Manonga Jovane (Exhibit C-2 – According to the Articles of Association, Public Deed No. 19,236). The corporate object or purpose of Claimant is *inter alia* the sale of all goods and commercial operations. The share capital or registered capital at the time of incorporation was 10.000 UDS. The directors of the company were Corporate Agents (BVI) Limited (British Virgin Islands) and Corporate Management St. Lucia LTD (Santa Lucia) and Corpag Management LTD (Santa Lucia).

93.     On 27 April 2012, Respondent sent a Request for Quotation nr. 6500204279 (Mr. Gregory Sorbara) to Claimant (Exhibit C-3). The quotation deadline was 3 May 2012.

19

94.     The Request for Quotation nr. 6500204279 regards the delivery of:

- 2.600.000 meter Steel Pipe GALV.1/2
- 950.000 unit Elbow ½ "90° GALV.
- 180.000 unit T 1/2 "GALV.
- 180.000 unit Valves with explosion-proof standard 1/2
- 180.000 Roll Teflon

95.     On 18 May 2012, Claimant filed an offer as part of the bidding process for all items mentioned above for the total price of 20.757.600,00 USD (Exhibit C-4).

96.     On 13 June 2012, Claimant received from Respondent the PO No. 1 in the amount of 20.757.600,00 USD. The delivery date was 31 August 2012 (Exhibit C-5).

97.     On 27 June 2012, as requested by Respondent, Claimant (Mr. Carlos Obregon) confirmed having received and accepted the PO No. 1 (Exhibit C-6).

98.     On 17 July 2012 Claimant requested Respondent by email if it was possible to receive an advanced payment with regard to PO No. 1, *i.e.* 30% against a guarantee letter in order to have the cashflow to work with factories simultaneously and guarantee the delivery on 15 August 2012 (Exhibit C-7).

99.     Respondent answered this request by stating (Exhibit C-7):

"*Dear Carlos*
*What about the remaining 70%. I can handle the following in order to help you improve delivery.*

*30% advance payment against bank guarantee valid for 30 days after delivery date.*
*70% immediately after delivery against inspection release. (partial approved)*

*Please let me know if my proposal meet your requirements.*"

100.    On 2 August 2012 Claimant responded that the above met their requirements. Claimant further requested Respondent to advise which inspection company was assigned, *i.e.* in order to provide for a pre-inspection (Exhibit C-7).

101.    On 19 September 2012, Respondent sent a Request for Quotation nr. 6500227262 (Mr. Gregory Sorbara) to Claimant (Exhibit C-8). The quotation deadline was 27 September 2012.

20

102.    The Request for Quotation nr. 6500227262 regarded the delivery of:

- 180 pieces Car Camioneta 8 4x2 Pick Up 4x2
- 20 pieces Car Pick Up 6 O 8 (EN V) 4x2 Chevrolet.

103.    On 27 September 2012, Claimant filed an offer as part of the bidding process for all items mentioned above for the total price of 14.280.000,00 USD (Exhibit C-9).

104.    On 19 October 2012, Claimant received from Respondent the PO No. 2. The delivery date was 31 January 2013 (Exhibit C-10).

105.    On 27 December 2012, as requested by Respondent, Claimant (Mr. Carlos Obregon) confirmed having received and accepted the PO No. 2 (Exhibit C-11).

106.    With regard to the items subject of PO No. 1, Claimant submitted several packing lists (Exhibit C-19):

- dated 6 December 2012 regarding 2.600.000 meter Steel Pipe GALV.1/2; 950.000 unit Elbow ½ "90° GALV.; 180.000 unit T 1/2 " TEE.
- dated 31 January 2013 regarding 180.000 Roll Teflon.
- dated 19 July 2013 regarding 180.000 1/2" Ball Valve.
- dated 9 September 2013 regarding 180.000 1/2" Ball Valve.

107.    Claimant also submitted several Inspection Release Notes, issued by B.I.E. Group, regarding the items subject of PO No. 1 (Exhibit C-18):

- on 13 December 2012 an Inspection Release Note was issued by B.I.E. Group regarding 2.600.000 meter Steel Pipe GALV.1/2; 950.000 unit Elbow ½ "90° GALV.; 180.000 unit T 1/2 "GALV.
- on 28 December 2012 an Inspection Release Note was issued by B.I.E. Group regarding 180.000 Roll Teflon.
- on 8 July 2013 an Inspection Release Note was issued by B.I.E. Group regarding 180.000 unit Valves with explosion-proof standard 1/2. It was noted: "*These valves are not manufactured to an explosion proof standard*".

108.    Claimant submitted as Exhibit C-12 the delivery proof item (January 2013) issued by DHL as Respondent's agent informing the Bill of Lading number 4SH041439 for PO No. 1, regarding the Teflon tape.

21

109.    With regard to the items subject of PO No. 2, Claimant submitted several packing lists (Exhibit C-19):

- dated 26 March 2013 regarding 2+36 Chevrolet Silverado.
- dated 1 April 2013 regarding 44+3+2+25+5 Chevrolet Silverado.
- dated 10 May 2013 regarding 1 Chevrolet Silverado.
- dated 28 May 2013 regarding 14 Chevrolet Silverado.
- dated 10 June 2013 regarding 4+6+17 Chevrolet Silverado.
- dated 11 June 2013 regarding 4 Chevrolet Silverado.
- dated 12 June 2013 regarding 5+4 Chevrolet Silverado.
- dated 13 June 2013 regarding 17 Chevrolet Silverado.

110.    Claimant also submitted several Inspection Release Notes, issued by B.I.E. Group, regarding the items subject of PO No. 2 (Exhibit C-18):

- on 9 February 2013 regarding 36+2 Chevrolet Silverado.
- on 9 March 2013 regarding 25+5 Chevrolet Silverado.
- on 27 March 2013 regarding 3+2+44+11+14 Chevrolet Silverado.
- on 22 May 2013 regarding 4+5+4+6 Chevrolet Silverado.
- on 5 June 2013 regarding 1+4+17 Chevrolet Silverado.
- on 6 June 2013 regarding 17 Chevrolet Silverado.

111.    Claimant submitted as Exhibit C-13 the delivery proof item (dated 30 November 2014) issued by Clover Integrated Logistics as Respondent's agent informing the Bill of Lading number SLSW046PEVGUT-35 for PO No. 2, regarding 58 Silverado Chevrolet (subject of PO No. 2).

112.    In the meantime all invoices with regard to the PO No. 1 and PO No. 2 were issued by Claimant between 1 December 2012 and 1 April 2013 for a total amount of 28,931,000.00 USD:

| Invoice | Date | Amount |
|---|---|---|
| PO No. 1 INV-000002 | 4 December 2012 | 15,102,000.00 USD |
| PO No. 1 INV-000006 | 28 January 2013 | 171,000.00 USD |
| PO No. 1 INV-000020 | 19 July 2013 | 4,640,000.00 USD |
| PO No. 2 INV-000004 | 1 April 2013 | 3,949,000.00 USD |
| PO No. 2 INV-000005 | 1 April 2013 | 363,000.00 USD |
| PO No. 2 INV-000008 | 26 March 2013 | 2,556,000.00 USD |
| PO No. 2 INV-000010 | 1 April 2013 | 2,150,000.00 USD |

113.    On 21 January 2015 Respondent's Accounts Payable Analyst notified Claimant of the following (Exhibit C-15):

22

*"Please know that all the invoice were approved and were sent to our headquarters to be paid. (…)*
*As soon as the invoices get paid I will be sending you a payment notification."*

114.  On the same day (21 January 2015) Claimant responded to Respondent (Exhibit C-15):

"*Thank you for your response. Do you know when the invoices are going to be paid?*"

115.  Still on the same day, Respondent replied (Exhibit C-15):

"*Thank you for your email, unfortunately I cannot give you an exact payment date for the invoice since all payments are made from the headquarters*

*Please note that the payments are delayed since we are also closing the books for the financial year 2014.*

*As soon as the invoice gets paid or any news regarding the payment is received I will be contacting you.*"

116.  On 5 February 2015 Claimant replied by stating (Exhibit C-15):

*"In this case, can you provide us with a headquarters contact for us to be able to obtain an actual status of these payments, considering that we are already in February and we haven't had any payment notification.*

*Thank you so much and we will appreciate any information that you can give us regarding this subject."*

117.  On 5 March 2015 Respondent replied (Exhibit C-15):

"*Thank you for your email.*

*We apologize for the effects of the delay in payments. Regarding the schedule of payments we cannot give you a specific date since the process have some parts we do control; mainly the transferring of funds by the end-user to Bariven in Venezuela.*

*The previous makes it impossible for us to give you an exact or estimated date. I can inform you that we are doing upmost to get your invoices are paid as soon as possible.*

23

*I also inform you that a reminder was sent to end-user to request the transfer of funds to pay the outstanding invoices*

*As soon as we receive an update we will contact you with the payment notification.*"

118.    On 1 December 2017 a letter was formally notified by Claimant to Respondent through PDVSA Services (Exhibit C-16):

"*Please be informed that Serama S.A., a legal entity organised and existing under the laws of the Republic of Panama ("Serama"), has requested us to represent it in the above mentioned matter.*

*As you know, Serama has delivered goods to Bariven S.A. ("Bariven") pursuant to various Purchase Orders in 2012 and 2013. All invoices for the delivery of these goods ("Invoices") are due and payable. Please find an overview of the Invoices, the corresponding Purchase Orders and the outstanding amounts attached (attachment). The total of outstanding amounts is USD 28.931.000,00, to be increased with statutory and/or commercial interest.*

*In this regard we remind you that Serama, through its legal advisor, Mr. Leonardo Britto, has contacted representatives of PDVSA Services B.V. with the purpose of achieving payment of the Invoices or receiving a proposal from PDVSA for swift settlement of the Invoices. Regrettably, Serama has received neither payment nor any proposal.*

*The Invoices were approved by Bariven and in your e-mail of 18 July 2017 to Mr. Leonardo Britto you have confirmed that Bariven does not contest the outstanding amounts. Despite the acknowledgement of the Invoices, the Invoices being due and payable for a considerable time and various payment demands, Bariven has not paid any of the Invoices.*

*We have been instructed to file a Request for Arbitration with the International Chamber of Commerce in order to obtain an enforceable arbitral award for payment of the Invoices and any related amounts, including statutory and/or commercial interest in respect of the outstanding amounts, against Bariven and/or PDVSA Services B.V. Unless you confirm in writing within 30 days from now that the outstanding amounts will be paid or that you are ready to start serious discussions about how the Invoices can be paid within a reasonable amount of time, we will file such Request shortly.*

*This letter is an act of Interruption of any limitation period in relation to any of the circumstances and/or claims addressed herein and in relation hereto (Section 3:317 Dutch Civil Code). This letter is directed to you in your capacity as an agent of Bariven for the purpose of the Purchase Orders and in your own capacity. Serama reserves all rights and waives none.*"

24

119.   In general terms, Claimant submitted that:

- between December 2012 and November 2014, Claimant complied with the obligations it had assumed under the Purchase Orders.
- the Parties followed the normal mechanism through the performance of the Purchase Orders, with minor differences between each transaction.
- Respondent did not voice any objections or concerns regarding the timeliness of delivery, the conformity of the goods delivered, or any other aspect of Claimant's performance of the Purchase Orders.
- none of the scenarios that would have allowed Respondent to withhold payment listed in Article 4(III) of the T&C occurred, and none was invoked by Respondent to avoid its payment obligations.
- Respondent breached its contractual obligations towards Claimant by failing to pay several invoices for goods that Claimant had delivered and acted in breach of Articles 6:81, 6:82 and 6:83 of the Dutch Civil Code ('DCC').
- the applicable prescription period, which – according to Article 3:307 of the DCC – is five years from the day following the one on which the debt-claim has become due and demandable, was interrupted last on 1 December 2017 (Exhibit C-16).

*c. Questions/issues raised by the Arbitral Tribunal*

120.   The facts described are straightforward, clear and support Claimant's claim without any reservation, but by way of its Procedural Order nr. 2 the Arbitral Tribunal acknowledged news regarding a decision rendered by the The Hague Court of Appeal setting aside an ICC award involving a procurement contract with Bariven S.A., which in essence says the following:

"*The Court of Appeal resolved that a procurement contract between Bariven S.A. as buyer and Wells Ultimate Service ["Wells"] as seller, should be partially annulled on public policy grounds, finding that the procurement contract had been obtained through corruption and that the arbitral tribunal had applied too stringent a standard in dismissing the corruption allegations. The Court of Appeal found that the arbitral tribunal had disregarded evidence which provided strong indicators that the contract was procured corruptly, such as the following:*

*Wells, the seller, was a shell company with no employees or office, or clients other than Bariven at the moment the procurement was signed, and was set up as part of a bribery scheme led by Mr. Rincón Fernández, who admittedly had paid bribes to ensure that his companies were placed on PDVSA bidding panels and won the contracts. Three former Bariven employees, convicted for taking bribes from Mr. Rincón's companies, were involved in the approval of contracts with Wells. It was also noted that the invoice for the purchase of the goods resold to*

25

*Bariven was 5% less than the resale price and that the 5% figure was identical to the annual profit margin reported by Wells in its accounts."*

121.    The Arbitral Tribunal noted that this arbitration and the case resolved before the Court of Appeal in The Hague share a number of common features: a procurement contract anno 2012, Bariven S.A. as buyer and ICC arbitration with seat in The Hague.

122.    The Arbitral Tribunal also acknowledged in its Procedural Order nr. 2 that Clause 19 of the T&C establishes that if the vendor or its employees receive payments or other special considerations from buyer, the purchase order may be cancelled.

123.    There are no allegations of corruption made by Respondent. There is no request to the Arbitral Tribunal to declare the agreement between the Parties null and void. Nonetheless, the Arbitral Tribunal holds that pursuant to both Dutch legislation and international public policy, it has the duty to make an assessment of the incidences of corruption that could affect the object of the arbitration and decide on the civil consequences of these incidences with respect to the validity of the agreement between the Parties[5].

124.    Indeed, it is the Arbitral Tribunal's duty to analyse, even *sua sponte*, that the present case does not breach international public policy and that any award rendered in due course is valid and enforceable (*cfr.* Article 1043a(3) DCP and Article 42 ICC Rules). Various tools have been developed by business organisations, international bodies, non-governmental organisations, academia, and the like, *e.g.* "Red flags" are indicators of illicit conduct.[6] In this regard, both contracts for corruption as well as contracts procured through corruption may breach international public policy.

125.    Accordingly, the Arbitral Tribunal invited the Parties to submit documents/evidence/witness statements with regard to the issues/questions identified in Procedural Order nr. 2. It was made clear that these issues/questions followed solely from the Request for Arbitration and the exhibits submitted by Claimant (Claimant's Statement of Claim), and could by no means be construed as indicating a lack of fairness or impartiality on behalf of the Arbitral Tribunal. In addition, it was emphasised that the issues/questions did not express any opinion of the Arbitral Tribunal with regard to the standard and burden of proof or the use of adverse inferences.

126.    Since most of the questions were phrased in a general way, the Parties were allowed to further elaborate but always within the framework of the finality as described in the preamble of

---

[5] Domitille Baizeau and Tessa Hayes, 'The Arbitral Tribunal's Duty and Power to Address Corruption Sua ponte', in Andrea Menaker (ed), International Arbitration and the Rule of Law: Contribution and Conformity, ICCA Congress, Series, Volume 19, pp. 225 – 265.
[6] Basel Institute on Governance, 'Corruption and Money Laundering in International Arbitration - A Toolkit for Arbitrators', 29 April 2019, Pag. 7.

Procedural Order nr. 2. If a Party was of the opinion that it could not adequately respond to requests/questions or provide an adequate response with regard to certain issues, such Party would have to identify whether such was the result of the non-existence thereof, the irrelevance thereof, the non-possession thereof, the professional legal privilege or institutional sensitivity thereof.

*d. Answers submitted by Claimant*

127.    Claimant submitted its answers on 6 February 2021 and stated as follows.

128.    Question No. 1: A general description of Serama S.A. as a legal entity, in particular its corporate structure

*Claimant submits that it was initially incorporated under the laws of Panama in 2006 as a shelf company (Exhibit C-2). The company remained inactive until 8 February 2012, when two Venezuelan nationals, Mr Carlos Omar Obregón Lovera and Mr Antonio Rafael Stefani Sucre, acquired its shares (Exhibit C-28 and C-35).*

*On 30 March 2012, Serama's Articles of Incorporation were amended and Mr Obregón Lovera, who held a majority of shares and had prior experience in the Venezuelan procurement and sales sector, was appointed as its President (Exhibit C-29).*

*Serama was conceived by Mr Obregón Lovera as a provider of procurement services for the energy and construction industries in Venezuela. In his role as President, Mr Obregón Lovera oversaw Serama's daily operations during the relevant period covered by the two Purchase Orders to which these arbitrations relate, i.e., years 2012 and 2013.*

*As an economy that has been traditionally centred around the oil industry (Exhibit C-44), Venezuela is highly dependent on foreign supplies (Exhibit C-45). Most large corporations in the country (which are mainly State-owned) (Exhibit C-44) have extensive procurement programs to acquire raw materials and the equipment needed for their operations. In this context, Petróleos de Venezuela, S.A. (PDVSA) operates as the head of a State-owned conglomerate with interests in vast sectors of the Venezuelan economy, including through subsidiaries in, among others, the following sectors: industrial (PDVSA Industrial and PDVSA Naval); public utilities (PDVSA Gas Comunal and PDVSA TV); infrastructure (PDVSA Desarrollos Urbanos and PDVSA Ingeniería y Construcción); and agriculture (PDVSA Agrícola) (Exhibit C-47).*

*Bariven, which is itself one of PDVSA's wholly owned subsidiaries, is in charge of the procurement of materials and equipment required for the operation of all PDVSA's subsidiaries,*

27

*and is also responsible for administering inventories, warehouses and the sale of unused assets (Exhibit C-27). In 2012 alone (the year in which the Purchase Orders were issued), Bariven made procurement purchases for PDVSA for an aggregate of US$13 billion (Exhibit C-32).*

*In that context, Serama was set up to provide a full product procurement service, operating from offices in Panama City and Caracas, and focusing on the energy and construction industries (Exhibit C-48).*

*Serama's range of services included the coordination of quality controls, inspections and logistics services, as well as post-sale services. The company worked with a number of major supply chain partners worldwide (Exhibit C-35).*

*As a procurement business, the company had a relatively small corporate structure comprised of six employees (Exhibit C-38), and sub-contracted most of its services – including logistics coordination, quality controls and inspections, and post-sale services – on an ad hoc basis and depending on the geographical location of each purchase.*

*From 2012 onwards, Claimant received no fewer than 20 Requests for Quotation to participate in procurement processes organized by Bariven alone, and submitted proposals in approximately 15 of those processes (although the only two which were awarded to Serama and fully executed were the ones which are the subject of these proceedings). In addition, the company was invited to submit offers in procurement processes organized by other public and private entities unrelated to PDVSA and Bariven including, among others, Siderúrgica del Orinoco, S.A. and Corpoelec C.A (Exhibit C-37, C-39 and C-42).*

129.    Question No. 2: The financial information (turnover, profit, exception costs, profit distribution, etc.) with regard to Serama S.A., relevant/related to the time of the Purchase Orders and the execution thereof.

*The Claimant attaches Serama's audited financial statements for 2012-2013 (the Financial Statements), which reflect the relevant financial information for the period in which the Purchase Orders were concluded (Exhibit C-36).*

130.    Question No. 3: What is or was the duration and nature of the commercial relationship between the Parties (apart from the Purchase Orders)?

*Between 2012 and 2015, Serama received more than 20 Requests for Quotations from PDVSA Services acting on behalf of Bariven inviting it to submit proposals for procurement process involving purchases for PDVSA and its subsidiaries (Exhibit C-46). Serama submitted proposals in response to approximately 15 of these invitations. However, the only two proposals which*

28

*were accepted by Bariven and executed by Serama were the Purchase Orders which underlie the Claimants' claim in these proceedings.*

*In March 2015, Serama was included in Bariven's official supplier panel (Exhibit C-38 and C-41). However, following Bariven's default under the Purchase Orders and Serama's unsuccessful attempts to settle the outstanding debt amicably, the company decided not to continue to participate any longer in Bariven's procurement processes.*

131.    Question No. 4: Which other companies submitted an offer/bid following the Requests for Quotation (Exhibits C-3 and C-8)?

*Bariven's procurement processes under the Requests for Quotations were held privately, and neither the identity of the participants nor the results of each process were disclosed. The Claimant therefore does not know which other bidders submitted bids in response to the Requests for Quotations.*

132.    Question No. 5: The contact person for Bariven S.A. mentioned on the Requests for Quotation (Exhibits C-3 and C-8) and on the Purchase Orders (Exhibits C-5 and C-10) is Mr. Gregory Sorbara (see also Exhibit C-7). What was the precise role held by Mr. Gregory Sorbara at the time in the chain of decision-making? Did Mr. Gregory Sorbara ever have any direct or indirect relationship with Serama's past or present employees/directors/agents/shareholders?

*Mr Sorbara was one of several Bariven purchasing officers in charge of coordinating Bariven's Requests for Quotations. The Claimant is not familiar with PDVSA/Bariven's internal structures and processes but understands that Mr Sorbara was in charge of purchases of vehicles and construction materials for Bariven. The Claimant also understands that the purchasing officers' role in the procurement process is to prepare Requests for Quotations in accordance with the requirements received from the PDVSA subsidiary requesting the purchase. The purchasing agent will usually collate proposals from interested parties and communicate them to the relevant PDVSA subsidiary, which will then make the purchasing decision. In the normal course, purchasing officers will usually then communicate the purchasing decision to the seller and coordinate with the seller the subsequent purchasing process on behalf of Bariven (as Mr Sorbara did in the case of Serama's Purchase Orders).*

*The Claimant notes that apart from the Requests for Quotations it received from Mr Sorbara, Serama received Requests for Quotations from eight other Bariven purchasing officers during 2012-2014 (Exhibit C-46).*

*The Claimant confirms that neither Mr Sorbara nor any other purchasing officers, employees or directors at Bariven, PDVSA and its subsidiaries have ever had any direct or indirect relationship with Serama's past or present employees, its directors, agents or shareholders.*

133.    Question No. 6: What was the role of Mr. Carlos Obregón Lovera at Serama S.A. with regards to the Requests for Quotation, the Purchase Orders or the execution thereof?

*As explained above, Mr Obregón Lovera was the President of Serama when the Purchase Orders were issued and the underlying transaction took place. Mr Obregón Lovera was Serama's principal contact with Bariven in relation to the Requests for Quotation and the Purchase Orders. Mr Obregón Lovera personally submitted Serama's quotations to Bariven (Exhibit C-30), and signed, on behalf of Serama, the acknowledgement of the Purchase Orders (Exhibit C-6 and C-11).*

*Mr Obregón Lovera was also personally involved in the process of execution of the Purchase Orders, the coordination of the purchases, and the inspection and shipment of the products and materials in the United States and China (Exhibit C-31 and C-33).*

134.    Question No. 7: In Exhibit C-7 there is a mentioning of a company 'Energreen S.A.' and of a Mr. Ricardo Lugo. What is the involvement of Energreen S.A. and/or Mr. Ricardo Lugo in the Requests for Quotation, the Purchase Orders or the execution thereof?

*Exhibit C-7 reflects an exchange between Mr Obregón Lovera (Serama) and Mr Gregory Sorbara (Bariven) with respect to the payment terms of Purchase Order No. 5100098888. In the exchange, Mr Sorbara agrees to Mr Obregón Lovera's request for an advance payment of 30 per cent of the amount of the order against a bank guarantee of the delivery and informs him of the timing and conditions of the payment of the balance under the Purchase Order.*

*The email also copies email addresses from Energreen S.A. (Energreen) and Mr Ricardo Lugo. Energreen is a Panamanian company that, following the award of the Purchase Orders to Serama, entered into an agreement with Serama to provide part of the financing for the purchases of goods to be delivered to Bariven under the Purchase Orders. Mr Ricardo Lugo was one of Energreen's directors (and also a director of a Venezuelan construction company called Constech, C.A., whose email address Mr Lugo used in this communication, but which was not involved in the financing). Mr Lugo was therefore copied in the relevant correspondence in connection with the financing of the transaction. Energreen's and Mr Lugo's involvement with Serama's Purchase Orders did not extend beyond providing financing to Serama.*

*The Claimant notes that it was not unusual for procurement companies such as Serama to enter into financing arrangements with third parties. This was particularly the case with Bariven's*

30

*purchases, as they often involved urgent purchases, where specific products of significant value needed to be sourced and delivered in a short timeframe, and (assuming compliance) payment would usually be received weeks or months after delivery.*

135.  Question No. 8: Could Serama S.A. submit the underlying invoices received from its suppliers with regard to the products subject of the Purchase Orders (Exhibits C-5 and C-10) in a way allowing the Arbitral Tribunal to cross reference to the invoices (Exhibits C-20 to C-26)?

*As the Tribunal is aware, the products subject to the two Purchase Orders were 200 vehicles and a range of construction materials, including more than 2.5 million units of steel pipes, nearly 1 million pipe elbows and 180,000 explosion-prove valves. Apart from the large quantity of the products requested, PDVSA/Bariven demanded very specific features for the goods that had to be procured by Serama. Further, Serama's costs under the Purchase Orders included the sourcing and purchase of the products from relevant sellers in the United States and China, as well as (in the case of vehicles) the required accessories, internal shipping costs and insurance. In this case, such costs were increased as the products had to be sourced from different suppliers (given the size of the orders) and delivered at a very short notice (between one and two months) in order to comply with the delivery terms under the Purchase Orders. Margins would also be affected in this case by the material counter-party credit risk posed by Bariven in 2012, as a Venezuelan State-owned entity.*

*As the Tribunal will understand, any business information regarding specific profit margins is highly sensitive for a procurement business such as Serama. In the context of this dispute, providing Serama's information regarding its profit margins under the Purchase Orders could compromise any future settlement of this dispute, as Bariven would be informed of Serama's expected profit. As such, Serama must respectfully decline to provide the requested invoices on the basis of the confidentiality and commercial sensitivity of the information requested.*

*The Claimant wishes to emphasize, as already explained in its Requests for Arbitration, that Serama's performance under the Purchase Orders followed Bariven and PDVSA Services' standard procurement process (Exhibit C-15 and C-16). The delivery of the underlying products to Bariven's satisfaction has been fully documented. Bariven has made partial payments under one of the Purchase Orders and, as late as 2015, confirmed that the outstanding amounts under all the invoices claimed in this arbitration were still outstanding (Exhibit C-16). Bariven's auditors, KPMG, even contacted Serama in 2013 and 2015 requesting confirmation of the balance owed under some of the invoices issued under the Purchase Orders (Exhibit C-34 and C-40).*

31

136.   Question No. 9: The invoices subject of Exhibits C-20 to C-26 indicate that payment is to be made into a bank account at the Société Générale Private Banking in Switzerland. Could this be further explained, taken that Serama S.A. is incorporated in and operates out of Panama?

*Serama held bank accounts in Switzerland as a matter of convenience, as it provided an efficient platform for a procurement business operating worldwide and in several currencies. It also facilitated dealing with suppliers based in countries subject to U.S. sanctions (such as China). The Purchase Orders expressly indicated that in each invoice Serama had to include its "bank account and routing information", without any limitation or specific condition. Accordingly, Serama's account with Société Générale was mentioned in each of Serama's invoices.*

137.   Claimant also submitted some general observations on the The Hague case mentioned by the Arbitral Tribunal in Procedural Order nr. 2 (referred to by Claimant as the 'Wells case').

*In PO No. 2, the Tribunal refers to a decision of The Hague Court of Appeal that set aside an ICC award in favour of Wells Ultimate Service LLC (Wells) against Bariven. The award was based on Bariven's failure to pay invoices for goods Wells had delivered. (Exhibit CLA-16) The Court of Appeal set aside the award because there was considerable evidence that Wells had obtained the underlying contract by bribing Bariven officers. The Wells case is now pending before the Dutch Supreme Court. A decision by the Supreme Court is expected to be rendered in the second half of May 2021.*

*Procedural Order No. 2 evidently seeks information about matters that the Court of Appeal considered useful in supporting its concerns about corruption. In Wells, unlike this case, such information had a confirmatory nature: the Wells bribery scheme had already resulted in a criminal investigation and convictions in the United States of individuals connected to Wells who had bribed PDVSA's and Bariven's employees. In that context, information about Wells' ownership and turnover, among other circumstances, confirmed that the bribery scheme had likely included Wells, as well as the related companies that had been the subject of the United States prosecution.*

*Here, of course, there is no criminal investigation, let alone convictions. While the Claimant appreciates the Tribunal's concern that any award be enforceable and recognizes its powers to enquire sua sponte on the issue of possible corruption, it respectfully submits that this case is not similar to Wells, and the information detailed in the first part of this submission does not give rise to any reasonable suspicion that the contract between the Claimant and Bariven involved any impropriety.*

32

*The Tribunal refers in Procedural Order No. 2 to two common features between Wells and this case: (i) that the procurement contract between the Claimant and Bariven was concluded in 2012, the same year as the Wells-Bariven contract; and (ii) that both contracts included arbitration clauses providing for ICC arbitration seated in The Hague. These features are unexceptional and are no evidence of corruption. In 2012, Bariven entered into procurement contracts worth US$13 billion. Bariven acted mainly through two PDVSA subsidiaries as agents, one based in Houston (PDVSA Services Inc.) and one based in The Hague (PDVSA Services B.V.), and used standard form contracts providing for ICC arbitration seated in Houston and The Hague, respectively. [The Claimant's counsel are aware of a large number of ICC arbitrations brought under standard Bariven contracts similar to those at issue in this case, that are currently pending.] Among this large volume of contracts, the existence of corrupt contracts with Wells and related entities involved in the United States prosecution cannot lead to an assumption that all US$13 billion worth of Bariven contracts in 2012 were corrupt.*

*In Wells, the Court of Appeal identified a series of "red flags" that suggested that the Wells contract "was concluded under the influence of corruption". The red flags were the following:*

*1) The first red flag was the US criminal proceedings, which unveiled corruption involving collusion between certain private companies and individuals, and PDVSA's and Bariven's employees. Many of the individuals investigated by the US authorities had pleaded guilty and confessed to the scheme through which Wells had obtained its contract with Bariven. In the US proceedings, Bariven filed a Motion for Recognition of its Rights as a Victim and Entitlement to Restitution as a third-party claimant in the criminal proceedings (Exhibit C-43). Bariven also participated in the ICC arbitration and raised a corruption defence against the Wells invoices.*

*2) The Court of Appeal also found that Wells was an irregular company, without any substantial business activity, that Bariven would not have accepted as a supplier but for the influence of corruption. The five Bariven employees who were involved in the approval process of Wells' bid confessed that they had received bribes. Wells had no other business activity, and its only profits were equivalent to its margins in the operations with Bariven. The Court noted that Wells' ultimate ownership was concealed in a trust.*

*3) Five other companies that were related to Wells participated in the bidding process and submitted artificial bids to allow Wells to offer the lowest price.*

*None of these red flags is present in this case.*

*First, there is no criminal proceeding or investigation whatsoever (let alone convictions) against Serama and/or its past or present employees, directors, agents or shareholders in the US, Venezuela, Panama, or any other jurisdiction on account of their dealings with Bariven. Nor has*

33

*there been any such proceeding against Bariven personnel in connection with the Serama transactions. That differs from Wells, where Bariven employees who approved Wells as a supplier confessed to doing so because they had received bribes, and a number of individuals were convicted.*

*Second, in Wells, Bariven participated in the ICC arbitration and it raised objections to Wells' invoices, including a corruption defence. Bariven also requested to be joined as a third-party claimant to the US criminal proceedings. Conversely, in this case: (i) Bariven has consistently recognized the transactions with Serama and confirmed that the outstanding invoices under both Purchase Orders had been approved and were not contested (Exhibit C-15); (ii) despite the in-person notification of these arbitrations in Bariven's offices in Venezuela by the Claimant on 26 May 2020, and several notifications via email and courier mail service from the Tribunal and the ICC Secretariat, Bariven has failed to appear in these proceedings; and (iii) in almost ten years since the Purchase Orders were issued, Bariven has not initiated any investigation in Venezuela or abroad against Serama and/or its past or present employees, directors, agents or shareholders.*

*Third, contrary to Wells, as shown by the Financial Statements, Serama has had business activities other than the Purchase Orders which are the subject of these proceedings. While operations under the Purchase Orders represented a substantial portion of Serama's business during the company's first year of operations in 2012, they were not its only sources of income. Moreover, unlike Wells' ultimate ownership, which was concealed in a trust, Serama's ultimate owners are individuals directly identified in the Certificate of Shares.*

*Fourth, in contrast to the bid-rigging scheme in Wells, no other company directly or indirectly affiliated with Serama, or its directors or shareholders, submitted a bid in the bidding processes that resulted in the Purchase Orders.*

*Fifth, contrary to Wells, Serama was (and continued to be) a "real" company with offices and personnel and operating activities in Venezuela and other countries.*

*In sum, the facts of this case differ substantially from those that led the Court of Appeal to conclude that the Wells contract was obtained under the "influence of corruption". In particular, as explained above, none of the common features identified by the Tribunal in Procedural Order No. 2 give rise to a suspicion of corruption and are unexceptional considering Bariven's standard contractual provisions and its volumes of operations.*

*The Toolkit for Arbitrators of the Basel Institute of Governance – especially highlighted by the Tribunal as a guiding instrument – compiles a red flag list to help arbitrators identify potential corruption in a given case (Exhibit CLA-15). This list includes, inter alia, inaccurate financial*

*statements, lack of a transparent corporate structure, personal connections, lack of usual documentation proving a normal commercial relationship, or criminal investigations carried out prior or during the arbitration proceedings. Several of these red flags match the circumstances in Wells.*

*However, in the case of Serama, none of these potential red flags appear – neither the described circumstances nor the company's background give rise to any suspicion. As scholars have noted, regardless of the approach on the applicable standard of proof of corruption that the tribunal might adopt, the preliminary step for an enquiry is to identify at least some indication that could raise the suspicion of corruption (Exhibit CLA-13 and CLA-14). Such indication is not objectively present in this case. Serama is a legitimate business that entered into standard transactions with Bariven, which failed to pay the outstanding invoices after Serama delivered the goods in accordance with the Purchase Orders. Bariven has not challenged – before or after these arbitrations were commenced – either the delivery of the goods under the Purchase Orders or the validity of the outstanding invoices.*

*e. Standard of proof*

138.   Pursuant to the generally accepted standards in international arbitration, the Arbitral Tribunal is bound to apply a preponderance of evidence standard [7] , meaning that based on the circumstances and possible indications of corruption (if any), the Arbitral Tribunal has to decide whether it was more likely than not that the agreement between the Parties was obtained through corrupt means, thereby identifying a causal link between a possible corrupt conduct and the agreement between the Parties.

139.   Claimant did not submit any specific argument with regard to the standard of proof, but the preponderance of evidence standard is in accordance with Dutch law, *i.e.* the statutory rules of evidence which can be found in Articles 149 to 207 of the DCP, more in particular Article 152 which provides that evidence can be provided by any means unless otherwise provided by law and that the evaluation of the evidence is left to the discretion of the judge, unless the law provides otherwise.[8] This general provision is the legal basis for the preponderance of evidence standard.[9]

---

[7] See e.g.: ICC Guidelines on Agents, Intermediaries and Other Third Parties, 19 November 2010; Vladimir Khvalei, "Using Red Flags to Prevent Arbitration from Becoming a Safe Harbour for Contracts that Disguise Corruption", ICC International Court of Arbitration Bulletin, 2013, Vol 24/Special Supplement; Emmanuel Gaillard, "La corruption saisie par les arbitres du commerce international", Revue de l'Arbitrage, 2017, Vol. 2017 Issue 3; Kathrin Betz, "Proving Bribery, Fraud and Money Laundering in International Arbitration", Cambridge University Press, 2017; Robert B. von Mehren, Burden of Proof in International Arbitration in Albert Jan van den Berg (ed), Planning Efficient Arbitration Proceedings: The Law Applicable in International Arbitration, ICCA Congress Series, Volume 7 Issue, p. 123 - 130.
[8] Article 152 DCP: "*1. Evidence may be provided by any means, unless otherwise provided by law. 2. The evaluation of the evidence is left to the discretion of the judge, unless the law provides otherwise.*"
[9]    See:    ECLI:NL:GDHA:2017:207,    ECLI:NL:GHSGR:2010:    BO1103,    ECLI:NL:RBHAA:2010:BO9653, CLI:NL:GHARL:2014:3368; Asser Procesrecht/Asser 3 2017/304; Pitlo/Rutgers & Krans, nr. 43.

35

140.   The mere presence of general red flags should not make an Arbitral Tribunal lean towards finding corruption. In order to tip the scale towards the existence of corruption in a particular case, red flags must be found with regard to a specific fact under the contract, and the Arbitral Tribunal should give each red flag a proportional weight, depending on the inference one could make therefrom.

*f. Considerations - Analysis*

141.   The Arbitral Tribunal's mandate is limited to the disputes brought before it under the terms of the arbitration agreement and to the legal claims made by the Parties.

142.   Claimant submitted a succinct but clear description of its company structure, office bearers, shareholders and activities. Claimant participated in 15 Requests for Quotation organized by Respondent; two of which were awarded during a period that Respondent made procurement purchases for some 13 Billion USD (2012). The Tribunal finds Claimant's explanation satisfactory.

143.   Claimant also explained its financial position, the financial arrangement it made as a procurement company with third parties, and submitted its audited financial statements for 2012-2013. Claimant was transparent in stating that with regard to PO No. 1 they requested a 30% advance from Respondent. The Tribunal finds Claimant's explanation satisfactory.

144.   Claimant explained the duration and nature of the commercial relationship with Respondent and confirmed that there was no direct or indirect relationship between Claimant's and Respondent's purchasing officer(s). Claimant gave clarifications with regard to the different persons and companies that appear in the exhibits. The Tribunal finds Claimant's explanation satisfactory.

145.   All contracts were well drafted and in a detailed way. All usual documentation proving a normal commercial relationship was submitted from the outset of these proceedings. Claimant was able to produce documentation for the services performed. With regard to the underlying invoices (question No. 8), Claimant submits that such information is highly sensitive and that information on profit margins could compromise any future settlement of the dispute. The Tribunal accepts this explanation.

146.   With regard to the Swiss bank account (question No. 9), Claimant explains that this provided an efficient platform for a procurement business operating worldwide and in several currencies. This is acceptable.

147.   Where in the The Hague case, several red flags were identified by the Court of Appeal: the US criminal proceedings, the fact that Wells was an irregular company and the fact that artificial bids were submitted during the bidding process, none of these red flags are present in the current arbitration proceedings. In addition, the Arbitral Tribunal cannot take the position that illegal activities in other contracts or circumstances are evidence that similar conduct taints the contracts in the current arbitration proceedings.[10]

148.   Although one could submit that there is a prevalence of corruptive behaviour in both Panama and Venezuela (see the Transparency International's Corruption Perceptions Index), there is no knowledge of any criminal investigation having been carried out by domestic authorities prior to or during the arbitration proceedings.

149.   In the context of the current arbitration proceedings, there is no element that gives rise to reasonable suspicion. The Arbitral Tribunal comes to the conclusion that there is no indication that would make it more likely than not that the Purchase Orders were obtained through corruption. There is in addition no indication that Respondent has ever challenged the contractual relationship between the Parties in any way since 2012, nor did Respondent raise any such plea during these proceedings.

*g. Prescription*

150.   According to Article 3:307 DCC the prescription period for Claimant's claim is five years from the day following the one on which the debt-claim has become due and demandable.[11]

151.   Claimant issued the first outstanding invoice on 4 December 2012.

152.   According to Article 3:318 DCC the prescription period is interrupted when the debtor recognizes the debt.[12] Respondent did so by way of its email dated 21 January 2015 (Exhibit C-15).

---

[10] B. M. CREMADES and D. J. A. CAIRNS, "Trans-national Public Policy", in International Arbitral Decision-Making: The Cases of Bribery, Money Laundering and Fraud" in Kristine KARSTEN and Andrew BERKELEY, eds., Arbitration – Money Laundering, Corruption and Fraud, Dossiers of the ICC Institute of World Business Law (2003), p 84.
[11] Article 3:307 DCC: 1. A right of action to claim performance of a contractual obligation to give or to do something becomes prescribed on the expiry of five years from the day following the one on which the debt-claim has become due and demandable (exigible).
[12] Article 3:318 DCC: The acknowledgement of a property right that is covered by a right of action interrupts the prescription of that right of action towards the person who has acknowledged this property right.

37

153.   In accordance with Article 3:317 DCC the prescription period will (again) be interrupted in case of a written notification requesting *in casu* payment of the outstanding invoices.[13] Such notification was made by Claimant on 1 December 2017 (Exhibit C-16).

154.   In accordance with Article 3:319 DCC the interruption of the prescription periods means that a new prescription period starts to run.[14]

155.   From the above follows that Claimant's claim is not time-barred.

*h. Conclusion*

156.   As stated above, the Arbitral Tribunal finds that the facts described and the exhibits submitted are straightforward and clear and support Claimant's claim. In addition, taking into account Claimant's answers, the facts and circumstances of the case do not give rise to any reasonable suspicion.

157.   The Arbitral Tribunal holds that Claimant's claim is well founded.

---

[13] Article 3:317 DCC: 1. The prescription period for a right of action to claim the performance of an obligation is interrupted by a letter of formal notice in which performance is demanded or by a written announcement in which the creditor unambiguous reserves his right to claim performance.
[14] Article 3:319 DCC: 1. When a prescription period for a right of action is interrupted in another way than by the start of a legal action that ultimately has been awarded by the court, then a new prescription period starts to run as of the day following the day of interruption. When a binding third-party ruling has resulted in a binding advice, then the new prescription period starts to run as of the day following the one on which the binding advice has been given to the parties. 2. The new prescription period has the same duration as the original, yet not longer than five years. Nevertheless the prescription will never set in earlier than the moment on which the original period would have expired without interruption.

C.     **Is Claimant entitled to receive statutory interests for commercial transactions (capitalized annually) on the outstanding invoices in accordance with Article 6:119a DCC?**

158.   Claimant requests the Arbitral Tribunal to order Respondent to pay statutory interest (for commercial transactions) on the claimed amounts (*cfr.* the outstanding invoices), calculated in accordance with Article 6:119a DCC from thirty (30) days of the receipt of each unpaid invoice. The commercial statutory interest owed by Respondent is to be calculated starting on the day after the expiry date for payment of the relevant invoices, until the day of effective payment.

159.   Article 6:119a DCC provides:

*Article 6:119a Statutory interest for commercial transactions*

*1. The compensation for damages, chargeable because of a delay in payment of a sum of money, consists, in case of a commercial agreement, of the statutory interest on the unpaid part of that sum from the day following the date that has to be considered as the expiry date for payment under the agreement up until and including the day on which the debtor has paid the amount chargeable to him. By commercial agreement is understood the agreement for remuneration (for consideration) which obliges one or more parties to deliver or to do something and which has been concluded between one or more legal persons or natural persons who, when entering into the agreement, acted in the pursuance of their professional practice or business. [...]*

*3. At the end of each year the amount on which the statutory interest is to be calculated, shall be increased with the unpaid statutory interest chargeable over that year.*

160.   In accordance with Article 4 of the T&C, Bariven was required to pay in full within 30 days from the date when PDVSA Services received Serama's invoices.

| Invoice | Date | Amount | Due Date |
|---|---|---|---|
| PO No. 1 INV-000002 | 4 December 2012 | 15,102,000.00 USD | 3 January 2013 |
| PO No. 1 INV-000006 | 28 January 2013 | 171,000.00 USD | 27 February 2013 |
| PO No. 1 INV-000020 | 19 July 2013 | 4,640,000.00 USD | 18 August 2013 |
| PO No. 2 INV-000004 | 1 April 2013 | 3,949,000.00 USD | 1 May 2013 |
| PO No. 2 INV-000005 | 1 April 2013 | 363,000.00 USD | 1 May 2013 |
| PO No. 2 INV-000008 | 26 March 2013 | 2,556,000.00 USD | 25 April 2013 |
| PO No. 2 INV-000010 | 1 April 2013 | 2,150,000.00 USD | 1 May 2013 |

161.    The statutory interest rates for commercial transactions are published by the Dutch Central Bank (De Nederlandsche Bank or DNB).[15] The applicable rates for the period 2012-2021 are:

| Period | Rate | Period | Rate | Period | Rate |
|---|---|---|---|---|---|
| 31/12/2012 | 8,00% | 31/12/2015 | 8,05% | 31/12/2018 | 8,00% |
| 30/6/2013 | 7,75% | 30/6/2016 | 8,05% | 30/6/2019 | 8,00% |
| 31/12/2013 | 8,50% | 31/12/2016 | 8,00% | 31/12/2019 | 8,00% |
| 30/6/2014 | 8,25% | 30/6/2017 | 8,00% | 30/6/2020 | 8,00% |
| 31/12/2014 | 8,15% | 31/12/2017 | 8,00% | 31/12/2020 | 8,00% |
| 30/6/2015 | 8,05% | 30/6/2018 | 8,00% | 30/6/2021 | 8,00% |

162.    The Dutch Civil Code also provides that the interest is compounded on a yearly basis.

163.    The awarding of (pre-award) interest is to compensate Claimant who, throughout the period of non-payment, was deprived of the use and disposition of capital that it was supposed to receive. The awarding of (post-award) interest until the day of effective payment aims to compensate Respondent's avoidance in making an arbitral award's payment in a timely manner.

164.    Therefore, the Arbitral Tribunal grants Claimant's claim to order Respondent to pay statutory interests for commercial transactions, capitalized annually, on the unpaid invoices from one day after the due date for payment of the relevant invoices (*i.e.* thirty days of the receipt of each unpaid invoice), until the day of effective payment (*cfr.* Article 6:119a DCC).

---

[15] Dutch Central Bank's statutory interest rates: https://www.dnb.nl/en/statistics/data-search/#/details/statutory-interest-rate/dataset/2ed0b77d-72c5-47e8-8a3d-0c213048e11d/resource/b0304270-e4fb-41d5-bc2f-c7547a72fc0b.

40

**D.      Which of the Parties shall bear the costs of the arbitration, including legal fees and costs (and post-award interests on these amounts), or in what proportion shall the costs be borne by the Parties?**

165.    Claimant submits that Respondent should pay all costs and fees of the Arbitration, including the administrative fees and costs of the ICC, the fees and expenses of the Arbitral Tribunal and of any experts appointed by it, and the Claimant's legal and other costs in these proceedings, with interest.

166.    The costs of the arbitration shall include the fees and expenses of the Arbitral Tribunal and the ICC administrative expenses fixed by the Court, in accordance with the scales in force at the time of the commencement of the arbitration, as well as the reasonable legal and other costs incurred by the parties for the arbitration (Article 38(1) of the ICC Arbitration Rules).

167.    Pursuant to Article 38(4) of the ICC Arbitration Rules, the final award shall fix the costs of the arbitration and decide which of the Parties shall bear them or in what proportion they shall be borne by the Parties.

168.    In making decisions on costs, the Arbitral Tribunal may take into account such circumstances as it considers relevant, including the extent to which each party has conducted the arbitration in an expeditious and cost-effective manner (Article 38(5) of the ICC Arbitration Rules).

*Fees and expenses of the Claimant's legal representation*

169.    Claimant submits as costs the fees and expenses of its lawyers, the firms Dechamps International Law and SSHJ Advocaten, and Mr. Jonathan J. Gass.

- Dechamps International Law: US$991.072,44;[16]
- SSHJ Advocaten: US$5.727,50; and
- Jonathan J. Gass: US$3.200,06.
- Expenses and disbursements: US$11.710,27.[17]

170.    Therefore, the Claimant's legal team's total fees and expenses amount to US$1.011.710,27.

171.    Claimant offered to provide copies of invoices and any other relevant documentation in relation to the payments mentioned and was transparent in that regard.

---

[16] Claimant submits that this amount reflects the amount of a fixed fee agreement entered into by Dechamps International Law with Claimant for its work in these proceedings.
[17] Claimant submits that this includes the cost of travel to client meetings, consultancy fees incurred by Claimant in relation to the preparation of its claims, and courier and copying costs.

172. Taking a common sense approach[18], the Arbitral Tribunal holds that Claimant's fees and expenses are reasonable and proportionate to the amount in dispute.

*Fees and expenses of the Tribunal and ICC's administrative fees*

173. At its session of 12 May 2021, the ICC Court fixed the Arbitral Tribunal's fees and expenses at 212.233,58 EUR .

174. The Arbitral Tribunal's fees and expenses were paid in full by Claimant.

*Interest*

175. The Claimant claims statutory interests on the costs incurred in connection with this dispute, at the same statutory interest rates for commercial transactions (capitalized annually) applicable to its substantive claim (cfr. Article 6:119a DCC) as of the date of the Tribunal's award.

176. The Arbitral Tribunal holds that interest can be granted as of 30 days after the notification of this award to Respondent.

*Allocation of costs*

177. The manner in which the costs are to be allocated is left to the broad discretion of the Arbitral Tribunal.

178. The Arbitral Tribunal considers that, in arbitration practice, the predominant criteria to be taken into account when allocating costs are (1) the outcome of the arbitration and (2) the conduct of the parties during the arbitration proceedings / surrounding circumstances.

179. Under the first criterion, the outcome of the arbitration, the prevailing practice in international arbitration is the 'cost follows the event' method. This method entails that, if a claimant is awarded the whole or a substantial part of what it claims, it will be the prevailing party. 'The event' is the successful outcome for it, and costs will 'follow the event' by being awarded to it. On the other hand, if a respondent successfully defeats a claim, 'the event' is the successful outcome for it, and it will be entitled to the costs of the arbitration.

---

[18] See: ICC Commission on Arbitration and ADR, 'Decisions on Costs in International Arbitration', ICC Dispute Resolution Bulletin, 2015, Issue 2, Exhibit CLA-19, para. 63 and p. 25.

180.   Thus, the 'cost follows the event' method entails that the party, which either is awarded the majority of its claims or successfully defends against the majority of the other party's claims, will be entitled to the costs of the arbitration.

181.   Under the second criterion, the conduct of the parties during the arbitration proceedings or – more general – any circumstance interacting with the proceedings and deemed relevant to be taken into account, can be a reason for a party to bear a larger part of the costs of the arbitration than it would have had to bear if such behaviour had not been displayed or the circumstance had not occurred.

182.   Based on the above, the Arbitral Tribunal decides that, since Claimant was successful with regard to its claims, Respondent should bear all costs in the total amount of  212.233,58 EUR (Arbitral Tribunal's fees and expenses) and the applicable statutory interest for commercial transactions (capitalized annually) on these amounts, as provided in Article 6:119a of the Dutch Civil Code, from 30 days after the notification of this award, until the day of effective payment.

43

## X.   FINAL AWARD

183.   In light of the arguments presented by the Parties and for the above mentioned reasons, the Arbitral Tribunal:

    (a)   **DECIDES** it has jurisdiction over the dispute;

    (b)   **DECLARES** that Respondent breached its obligations under the Purchase Orders and Dutch law;

    (c)   **ORDERS** Respondent to pay the outstanding invoices of Claimant (INV-000002, INV-000006, INV-000020, INV-000004, INV-000005, INV-000008, INV-000010) in the total amount of 28.931.000,00 USD;

    (d)   **ORDERS** Respondent to pay the Claimant the applicable statutory interest for commercial transactions (capitalized annually) on the Claimant's unpaid invoices, as provided in Article 6:119a of the Dutch Civil Code, from one day after the Due Date for payment of the relevant invoices, until the day of effective payment, according to the following schedule:

| Invoice | Amount | Due Date |
|---|---|---|
| PO No. 1 INV-000002 | 15,102,000.00 USD | 3 January 2013 |
| PO No. 1 INV-000006 | 171,000.00 USD | 27 February 2013 |
| PO No. 1 INV-000020 | 4,640,000.00 USD | 18 August 2013 |
| PO No. 2 INV-000004 | 3,949,000.00 USD | 1 May 2013 |
| PO No. 2 INV-000005 | 363,000.00 USD | 1 May 2013 |
| PO No. 2 INV-000008 | 2,556,000.00 USD | 25 April 2013 |
| PO No. 2 INV-000010 | 2,150,000.00 USD | 1 May 2013 |

    (e)   **ORDERS** Respondent to pay Claimant the Arbitral Tribunal's fees and expenses fixed by the ICC Court in the amount of 212.233,58 EUR and Claimant's legal costs in the amount of 1.011.710,27 USD and the applicable statutory interest for commercial transactions (capitalized annually) on these amounts, as provided in Article 6:119a of the Dutch Civil Code, from 30 days after the notification of this award, until the day of effective payment.

**Place of arbitration: The Hague, The Netherlands**

**Date: 30 July 2021**

44

| Juliet BLANCH | Pilar PERALES VISCASILLAS |
|---|---|
| Co-arbitrator | Co-arbitrator |

Dirk DE MEULEMEESTER

President

45